IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| JACQUELYN GILES, individually | § | |
| and as Special Administrator of | § | |
| the Estate of Jeff L. Giles, deceased, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CASE #4:04-cv-04245-JPG |
| | § | |
| WYETH, INC., a Delaware Corporation | § | |
| and its wholly-owned subsidiary, | § | |
| WYETH PHARMACEUTICALS, | § | |
| formerly known as AMERICAN HOME | § | |
| PRODUCTS CORPORATION, | § | |
| Defendant. | § | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
WYETH'S MOTION TO EXCLUDE
DR. GLENMULLEN'S AND DR. MARIS' OPINIONS
<u>BASED ON FEDERAL RULE OF EVIDENCE 702</u>**

Respectfully submitted,

Arnold Anderson (Andy) Vickery
Texas State Bar No. 20571800
VICKERY WALDNER & MALLIA, LLP
One Riverway Drive, Suite 1150
Houston, Texas  77056-1920
Telephone: 713-526-1100
Facsimile: 713-523-5939
Email: andy@justiceseekers.com

# **Table of Contents**

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Wyeth's 180-Degree and Judicial Discretion . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Argument and Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

I.  PLAINTIFF'S EXPERTS ARE EMINENTLY QUALIFIED AND
    "INTELLECTUALLY RIGOROUS" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    A.  Harvard Clinician Glenmullen Wrote About His Patients'
        Experiences with SSRI-Induced, Akathisia-Mediated,
        Suicidality Long Before He Became Litigation Expert . . . . . . . . . . . 8

    B.  Professor Maris Employs the Same "Psychological Autopsy"
        Methods in this Case that He has Numerous Times in His
        Professional Life as a Noted Suicidologist  . . . . . . . . . . . . . . . . . . . 10

II. PLAINTIFF'S EXPERTS' OPINIONS IN THIS CASE SATISFY ALL
    FOUR *DAUBERT* FACTORS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    A.  General Causation is "Generally Accepted"  . . . . . . . . . . . . . . . . . . 12

    B.  A Host of Peer-Reviewed Literature Supports the Opinions . . . . . . 13

    C.  The Hypothesis is Testable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    D.  The Rates of Error are Within Scientific Norms and Acceptable
        Probability Limitations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

III. THERE IS AMPLE EVIDENCE OF GENERAL CAUSATION  . . . . . . . 17

    A.  Wyeth's Own Clinical Trial Data Regarding Effexor Shows
        Marked Risk for Suicidality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

B.    Wyeth's Internal Causality Assessments Also Establish Causality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

C.    Available Epidemiological Evidence Condemns Effexor . . . . . . . . 21

D.    The Pediatric Data and Wyeth's "Dear Doctor" re Same Establish Causality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

E.    The FDA's "Reclassified" Suicidality Data Establishes Causality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

F.    The Scientific Literature Corroborates Causality . . . . . . . . . . . . . . 23

IV.    THERE IS ALSO EVIDENCE OF SPECIFIC CAUSATION . . . . . . . . . . 23

A.    There is Ample Evidence to "Rule In" Effexor . . . . . . . . . . . . . . . . 24

B.    The Experts Reasonably "Ruled Out" Other Suicide Risk Factors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

1.    Jeff had undergone successful surgery to alleviate his chronic pain . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

2.    Jeff was going hunting with his son on the day of his death . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

3.    Jeff had lots of "papers" and lots of job opportunities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

4.    On October 28, 2002, Dr. Pramote diagnosed a one-time "mild to moderate" depression . . . . . . . . . . . . . . . . 28

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

## **Table of Authorities**

**Case**                                                                                 **Page(s)**

*Blanchard v. Eli Lilly & Co.*,
    207 F.Supp.2d 308 (D.Vt. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Caraker v. Sandoz Pharmaceuticals Corp.*,
    188 F.Supp.2d 1046 (S.D.Ill. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

*Cassidy v. Eli Lilly*,
    Civil Action 821, U.S.D.C. (W.D.Pa. May 30, 2002, Ambrose, C.J.) . . . . 13

*Daubert v. Merrell Dow Pharm., Inc.*,
    509 U.S. 579 (1993) . . . . . . . . . . . . . . . . 1, 2, 3, 7, 8, 11, 12, 13, 14, 16, 30

*Daubert v. Merrell Dow Pharms., Inc.*,
    43 F.3d 1311, 1317 (9th Cir.1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Forsyth v. Eli Lilly & Co.*,
    904 F.Supp. 1153 (D. Hawaii 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*In re Commitment of Simons*,
    213 Ill.2d 523, 821 N.E.2d 1184 (Ill. 2004) . . . . . . . . . . . . . . . . . . . . . . . . 12

*Kumho Tire Co., Ltd. v. Carmichael*,
    526 U.S. 137 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 12

*McCulloch v. H. B. Fuller Co.*,
    61 F.3d 1038, 1045 (2nd Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Mendes-Silva v. U.S.*,
    980 F.2d 1482 (D.C.Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Schwab v. Philip Morris USA, Inc.*,
    449 F.Supp.2d 992, 1249-50 (E.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . . . . 16

*S.M. v. J.K.*,
     262 F.3d 914, 921-22 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Tobin v. SmithKline Beecham Pharmaceuticals*,
     164 F.Supp.2d 1278 (D.Wy. 2001) . . . . . . . . . . . . . . . . . . . . . . . 4, 13, 14, 25

**Statutes and Rules**                                                   **Page(s)**

Fed. R. Ev. 104 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

## Introduction

Plaintiff has two liability experts in this case, *i.e.*, Joseph Glenmullen, M.D., a Harvard psychiatrist, clinician, and author; and Ronald Maris, Ph.D., one of the foremost suicidology experts in this country.  Both have served as experts in other SSRI suicide cases; neither has ever been excluded on *Daubert* grounds in any such case.  In this case, both have offered opinion testimony that (a) Effexor does cause suicidality in a "small vulnerable subpopulation" of patients, and (b) it was a proximate cause of Jeff Giles' death.  Wyeth seeks to exclude both experts' opinions on both issues.

Meanwhile, Plaintiff has filed her own separate *Daubert* challenges to the testimony of two of Wyeth's experts.  In our Brief in support of that Motion, we lay out much of the law and the science.  For the sake of brevity, we hereby incorporate those arguments, authorities and evidence herein, and will try to avoid unnecessary duplication.  For the following reasons, Wyeth's motion should be denied.

## Wyeth's 180-Degree and Judicial Discretion

It is beyond cavil that a *Daubert* decision is committed soundly to judicial discretion.  And there is no dispute about the fact that, when making such a decision, the Court has enormous latitude about what it may consider and it is not fettered by normal rules of evidence.  Rule 104, Fed.R.Ev.  It would seem, therefore, that, at the outset, it might be of interest to the Court to know that less than one year ago Wyeth

took a completely different approach to the issue of general causation in another Effexor-suicide case.

By way of explanation, as in most pharmaceutical cases, Wyeth's brief in this case focuses on two different causality issues. The bulk of the brief is focused on the question of general causation, *i.e.*, whether Effexor can cause some people to commit suicide. Only a few short pages are devoted to specific causation, *i.e.,* whether Effexor was a proximate cause of Jeff Giles' suicide.

This represents a 180-degree paradigm shift in Wyeth's litigation strategy. On July 31, 2006, in the Effexor-suicide case of *Ackermann v. Wyeth*, the defendant filed its *Daubert* motion challenging the testimony of Irish neuro-psychopharmacologist Dr. David Healy. Significantly, Wyeth <u>did not</u> seek to exclude Dr. Healy's general causation testimony. Mind you, it did not concede general causation either. However, realizing there is ample scientific support for Plaintiff's general causation arguments, it merely decided to litigate the issue in the preferred "traditional" way espoused by the *Daubert* court itself, *i.e.,* via "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof."[1] Exhibit 1 (Affidavit of Andy Vickery). Now, only a few months later, the bulk of its

---

[1] *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 595-96 (1993).

briefing is devoted to the general causation issue.  What has happened?  Has the science changed?  Or is it simply a change in litigation strategy?[2]

The only arguable, significant change in the scientific landscape is the FDA's November 16, 2006 Memorandum, Wyeth's Ex. 25, summarizing its reclassification and reanalysis of the various manufacturers' suicidality data.  Wyeth's portrayal of this analysis is there was "*no* association between antidepressant use and *completed suicide*".[3]  Brief at 2.  That one select sound bite hardly fairly portrays the FDA's findings.  In fact, in a bit of a 180-degree of its own, the FDA, which had previously tip-toed around the "activation syndrome"[4] now stated it has been "common lore" in

_____

[2]  Perhaps the change was precipitated by the fact that, in *Ackermann*, the plaintiff had the unmitigated gall to challenge the scientific foundation for Wyeth's experts' general causation opinions.  Exhibit 2 (Plaintiff's *Daubert* Motion, *Ackermann v. Wyeth*).  A similar challenge has been filed against two of the same experts in this case.  It may be, then, nothing more than a "sauce for the goose; sauce for the gander" stratagem.

[3]  This is not surprising.  In all of the pooled trials there were only about 100,000 patients.  As the December 2006 Simon article explains, this is the minimum number of patients one would have to have if the outcome of interest was completed suicide.  Exhibit 3 (Simon, *The Antidepressant Quandary–Considering Suicide Risk When Treating Adolescent Depression*, N Engl J Med 355:26, December 28, 2006, 2722-2723). Given the careful monitoring by psychiatrists, high drop out rates, concomitant medications, and other prophylactic measures, it would be exceedingly unlikely to have completed suicides in clinical trials.  This is, indeed, the very reason Eli Lilly's expert consultants told it in 1990 that examining this data for suicidality was like looking for a "needle in the haystack."  Exhibit 4 (Needle in the Haystack, Presentation to the FDA, February 2, 2004).  This is also the reason that, in analyzing the issue, the FDA has focused on the full spectrum of suicidal thought and behavior ranging from suicidal ideation on one end to completed suicides on the other.  Wyeth Ex. 25.  It is also one of the reasons that Wyeth's own expert, Dr. Valuck, chose to focus his recent published paper on suicide **attempts**.  Exhibit 5 at 20 (Robert Valuck deposition excerpts).

[4]  This is bureaucratic-speak for the drug-induced phenomenon that the scientific literature and the DSM have long called "akathisia."  As discussed, *infra*, it is the most likely, "biologically plausible" trigger for Jeff Giles' suicidality.

the medical community for decades that antidepressant-induced energization increases the risk of suicide for depressed patients during the early course of their treatment. Wyeth Ex. 25 at 2.

It also corroborated the fact that, even though these drugs may help some patients, "paradoxically," they trigger suicidality for others. *Id*. at 46. This is the "small vulnerable subpopulation" about which Dr. J. John Mann, consultant to Eli Lilly and expert for both GSK and Pfizer in SSRI-suicide cases, wrote in 1991 and 1992.[5] This paradoxical phenomenon creates the "redistribution of risk" that Harvard psychopharmacologists Teicher and Cole warned about in 1993.[6] Many patients are

_____

[5]    Wyeth's memorandum cites our experts' use of the phrase, "small vulnerable subpopulation," as if it were some novel, cockamamie theory cooked up by a couple of guys who were hired by a plaintiff's lawyer. Nothing could be further from the truth. The phrase originated in the 1991 article by Dr. J. John Mann, consultant to Prozac manufacturer Eli Lilly on this issue and subsequently litigation expert for both Pfizer (mfr. of Zoloft) and for GSK in the *Tobin* Paxil case. Exhibit 6 (Mann & Kapur, *The Emergence of Suicidal Ideation and Behavior During Antidepressant Pharmacotherapy*, Arch Gen Psychiatry, Vol. 48, November 1991, 1027-1033). Dr. Mann began his peer-reviewed article with a lamentation about iatrogenic suicidality and ended with a recommendation for warnings and specific testing (including via rechallenge).

He reprised the same phrase in his 1992 Consensus Statement for the prestigious ACNP. Exhibit 7 (Mann, *et al.*, *Suicidal Behavior and Psychotropic Medication*, Neuropsychopharmacology 1993, Vol 8, No. 2, 179-183). Other industry affiliated writes have also suggested there are some people who are simply "constitutionally" redisposed, or "vulnerable," to these side effects. *E.g.,* Exhibit 8 (Lane, *SSRI-Induced Extrapyramidal Reactions and Akathisia*, B.J. Psychopharmacology 12(2) (1998) 192-214).

[6]    Exhibit 9 (Teicher MH, Cole JO, *et al.*, *Antidepressant Drugs and the Emergence of Suicidal Tendencies*, Drug Saf 1993; 8(3):186-212). In a 1990 letter so confidential that he typed it himself, Lilly consultant Dr. Carl Parker described how Prozac might simultaneously help some patients, but harm others. Exhibit 10 (Parker letter to Weinstein, 8/24/90). He elaborated that this phenomenon would likely mask the suicidality phenomenon if one looked at the data, en masse, for evidence of an increased risk. For this reason, as he and other Lilly consultants explained, searching for suicidality in the drug makers' clinical trial data is somewhat like looking for the proverbial "needle in a haystack." Exhibit 4.

helped by these drugs and "swear by" them. Others, paradoxically, suffer both akathisia and suicidality as a result of them. It is these latter patients, and their physicians, who are in desperate need of prominent, adequately conveyed warnings.

Finally, the major announcement in the wake of the December 2006 FDA Advisory Committee meeting was its recommendation that the BLACK BOX warning for suicidality be further extended to include patients in the 18-24 year old age group, for whom the increased risk, as measured by an "odds ratio," was 2.30. Wyeth Ex. 25 at Table 18. Although we agree with Wyeth's expert, Dr. Gibbons, that there is considerable illogic in the FDA's attempt to parse out the data in narrow age-based segments[7], IF one wants to employ that approach, it is quite significant that, according to this same Table 18, the "odds ratio" for 46-year old patients like Jeff Giles was an almost identical 2.29:

---

[7]   Exhibit 11 at 29-30 (Dr. Robert Gibbons deposition excerpts). Dr. Gibbons deposition is interesting, to say the least. He testified that, not only has the FDA gotten it all wrong with respect to kids under 18, young adults between 18 and 24, and by parsing the data in ten year age increments, but also that Wyeth itself was wrong in issuing a *sua sponte* warning about pediatric suicidality in August of 2003. *Id.* at 25-28.

Table 18:    Suicidal Behavior Risk for Active Drug relative to Placebo
             – Preparation or Worse – Adults with Psychiatric Disorders
             – By Age (Excerpts)

| Age Range | Odds Ratio | 95% Confidence Interval | p-value |
|-----------|-----------|-------------------------|---------|
| <25 | 2.30 | 1.04 - 5.09 | 0.04 |
| 45 - 54 | 2.29 | 0.73 - 7.14 | 0.15 |

With respect to this FDA Table, Wyeth will, quite properly, point out that (a) the confidence interval for the 45-54 age group includes the integer "1," which means that one cannot exclude the *possibility* that the drug's effect was actually protective, and (b) the "p-value" was only .15, meaning we are only 85% sure of the results, instead of 96% as we are with regard to the 18-24 group. These observations may be scientifically appropriate, but are legally misguided. The law concerns itself with *probabilities*. The wide confidence interval indicates the "real risk" for the older patients could be only 0.73, but the vast majority of the interval lies above 2.0, and, indeed, it might be as high as 7.14. Moreover, as Wyeth's candid expert, Dr. Valuck explained, the **most likely** or *probable* risk (as to which we are 95% sure) is **2.29**:[8]

He explained:

---

[8] Exhibit 5 at 53-55. Although Dr. Valuck was concerned about the breadth of this interval, he also pointed out that, "as you reduce your level of confidence from 95 down to 90, 80, 70, 60, yes, the width of the confidence interval will narrow." *Id.* at 56-57. He is capable of doing the calculations at a 51% "preponderance of the evidence" interval, but did not do so.

> [T]he most probable estimate, according to this calculation, is 2.29. That is the best guess. The actual effect size estimate they present is 2.29. . . . The scientific probability of that size of an effect being seen just simply due to chance is 15 percent. . . . We're 95 percent sure that the true number is between 0.73 and 7.14.

For those who are inclined to genuflect at *Daubert II*'s "magic line" of 2.0+, this magnitude of risk certainly suffices.[9]

The long and short of it is there have been no dramatic scientific developments exonerating Effexor with regard to adult suicidality since Wyeth filed its *Daubert* motion in the *Ackermann* case. Rather, taken in toto, the FDA's November 16th Memorandum supports the view that (a) Effexor and the other modern antidepressants do, paradoxically increase the risk of suicidality for a few "vulnerable" adult patients, and (b) the most likely mechanism of action is the "activation syndrome" (FDA's chosen phraseology for what most scientists call "akathisia"). Taken on balance, the FDA's Memorandum supports both the general and specific causation opinions of Plaintiff's experts in this case. This leaves the Court, necessarily, with the following question:

> If the scientific evidence on July 31, 2006, was such that no *Daubert* challenge was thought by Wyeth's counsel to be warranted with regard to the issue of general causation, then why should I exercise my considerable judicial *discretion* by considering such a challenge at this juncture?

---

[9] *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1317 (9th Cir.1995).

We do not have a good answer to that question.  Perhaps Wyeth's counsel will.

## Argument and Authorities

## I.   PLAINTIFF'S EXPERTS ARE EMINENTLY QUALIFIED AND "INTELLECTUALLY RIGOROUS"

Although Wyeth makes no qualifications challenges to either Drs. Glenmullen or Maris, because the closest thing we have to a litmus test under *Daubert* and its progeny is the *Kumho*[10] "intellectual rigor" inquiry, it is helpful, at inception, to review the experts' backgrounds and credentials.

### A.   Harvard Clinician Glenmullen Wrote About His Patients' Experiences with SSRI-Induced, Akathisia-Mediated, Suicidality Long Before He Became a Litigation Expert.

Dr. Joseph Glenmullen is a well-educated, credentialed, and experienced psychiatrist with extensive specialized expertise in psychopharmacology.  He has been providing psychiatric care, including the prescription of SSRI drugs, to Harvard students for the past two decades.

In 2000, well before he ever served as an expert in any civil litigation, Dr. Glenmullen published a book entitled PROZAC BACKLASH.[11]  Chapter 4, reproduced

---

[10]  *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999).

[11]  In a slight affront to Lilly's trademark, Dr. Glenmullen used the word "prozac" in a more generic sense, referring to all of the current generation of serotonergic antidepressants.  He made it quite clear that the side effect of akathisia was a classwide effect, and it includes Effexor.  Exhibit 12 at 135-186.

Although the drug companies' academic experts are wont to demean Dr. Glenmullen by arguing that he is not an academic and saying the book was not "peer-reviewed," in fact it is based

in its entirety, Exhibit 12, was devoted to akathisia, which he, adopting a patient's

description of how it felt, titled "*Bones Rattling Like Tuning Forks*." Dr. Glenmullen

chronicled his clinical experience with two patients who became agitated and suicidal

on SSRI's, and summed up the relationship with the following:

> The classic papers on drug-induced agitation describe it as
> an "abject terror" that can be "more difficult to endure than
> any of the symptoms for which they [the patients had been
> originally treated." . . .  Some patients describe feeling as
> if their bones are tuning forks rattling inside their bodies.
> Others say it is like living twenty-four-hours-a-day with the
> sensation of someone scratching their nails on a
> blackboard. . . .  In a particularly dangerous scenario,
> patients who have not been warned of the side effect can
> misinterpret it as a grave worsening of their condition and
> become despairing and suicidal.

*Id.* at 153.

The "intellectual rigor" and "differential diagnosis" approach that Dr.

Glenmullen utilizes in this case to opine that Effexor-induced akathisia triggered Jeff

Giles' suicidality is the same as that which he used to diagnose and treat these

Harvard students.  Under *Kumho* and *Joiner*, this suffices.

---

on extensive, personal clinical experience and it is thoroughly researched and heavily footnoted with
references to both scientific literature and internal Eli Lilly documents.  Dr. Glenmullen's interest
in the issue of SSRI-induced suicidality began as a result of clinical experiences with two student
patients who became suicidal while taking the SSRI drug Prozac.  This experience based foundation
is perfectly "reliable" under *Joiner* as the court recently found in *Radke v. Par*.  Exhibit 13 (*Radke*
Opinion).

**B.      Professor Maris Employs the Same "Psychological Autopsy" Methods in this Case that He Has Numerous Times in His Professional Life as a Noted Suicidologist.**   Dr. Maris has been researching, writing, and teaching suicidology for a lifetime.  He is a distinguished professor (emeritus) at the University of South Carolina, a teacher of psychiatric residents, author of numerous articles and the author/editor of many books (including one entitled THE BIOLOGY OF SUICIDE),[12] past president of the American Association of Suicidology, and former editor-in-chief of its peer-reviewed journal, *Suicide and Life Threatening Behaviors*.  His initial dissertation research involved a large scale epidemiological study, employing the same kind of "psychological autopsy" methodology he uses in this case.

Dr. Maris is the lead author in the only COMPREHENSIVE TEXTBOOK OF SUICIDOLOGY.  This book lists more than 60 potential "risk factors" for suicide, so experts can focus on them to either "rule them in" or "out."  One of these is low 5HIAA (the serotonin metabolite), a physical  phenomenon which the SSRI drugs actually replicate.[13]  Dr. Maris' peer-reviewed writings pare this list down to 15 generally accepted "predictors" of suicide.  The methodology which one uses to focus

---

[12]  Chapter 7 of this 1986 book (predating Prozac in this country) examined the relationship between *Human Aggression and Suicide*.  It was written by two prominent NIMH scientists, and concludes with a very definite correlation between serotonin and aggression/suicidality.  Exhibit 14 at 156-157.  (Maris, *et al.*, THE BIOLOGY OF SUICIDE, 1986).

[13]  Exhibit 15 at 414 (Maris, *et al.*, COMPREHENSIVE TEXTBOOK OF SUICIDOLOGY (2000), Table 17.1).  Wyeth expert Gibbons confirms this role of serotonin and its metabolite.  Exhibit 11 at 40-41.

on these risk factors, rule them in, and rule them out, is called "psychological autopsy." It is a subspecies of "differential diagnosis," specifically for suicide cases, and has been recognized by courts and scientists as being <u>the</u> most scientifically rigorous and reliable.[14]

Dr. Maris has adapted this long-recognized methodology to incorporate consideration of the "Teicher Phenomenon" of SSRI-induced suicidality, denominated as such by Eli Lilly itself. His Psychological Autopsy checklist was used in this case. Exhibit 16 (SSRI Psychological Autopsy & Death Investigation on Jeffrey Giles). It comports in all material respects with the *Daubert* sufficient, peer-reviewed recommendations of one of his peers who is currently serving as an expert for GSK in a Paxil-suicide case.[15]

Therefore, when Dr. Maris opines that Effexor is a risk factor for suicide, and that none of the other risk factors present in Jeff Giles' life would account for his death in the absence of his demonstrable Effexor-induced akathisia, he is on sound and familiar ground. He uses the same "intellectual rigor."

---

[14] *E.g., Blanchard v. Eli Lilly & Co.*, 207 F.Supp.2d 308 (D.Vt. 2000).

[15] Exhibit 17 (Maris Affidavit, *Miller v. GSK)*. Ironically enough, in that case, Dr. Berman did not even use the psychological autopsy method he himself recommends. This is true even though his own current article in *Suicide and Life Threatening Behaviors* specifically recommends it as a means of surmounting *Daubert* challenges. Exhibit 18 (Berman, *et al.*, *Standardizing the Psychological Autopsy: Addressing the Daubert Standard, Suicide and Life-threatening Behavior*, Volume 36, Number 5, October, 2006: 511-518).

## II.    PLAINTIFF'S EXPERTS' OPINIONS IN THIS CASE SATISFY ALL FOUR *DAUBERT* FACTORS.

As we have seen in the foregoing section, both experts satisfy the "intellectual rigor" test of *Kumho*.  This is the closest thing we have to a litmus test for reliability. They also satisfy each of the four, non-exclusive *Daubert* factors.  Because these factors are briefed fairly extensively in our own separate *Daubert* motion, we will mention them very briefly herein.

### A.    **General Causation is "Generally Accepted."**    The pharmaceutical industry **lost** the *Daubert* case.  They had sought to impose scientific orthodoxy on drug cases by enshrining the "general acceptance" test of *Frye*[16] onto all scientific testimony.  They lost.  The Supreme Court held that general acceptance is one of four different factors to be considered, and that none was *sine qua non*.  Nonetheless, where, as here, there is general acceptance of a scientific proposition, that should end the inquiry.

The link between SSRI drugs and suicidality, particularly suicidality which is mediated by akathisia, is generally accepted.  This causal chain was incorporated into the DSM-IV-TR in 2000 and, as noted in our separate motion, is even included in the textbook of Wyeth's expert, Dr. Schatzberg.  Exhibit 19 (DSM-IV-TR) and Exhibit

---

[16] Although the admissibility of expert opinion testimony in this diversity case is governed by federal law, it is intriguing to note that in Illinois, which is a modified *Frye* state, non-novel testimony like that which is involved in this case is not even subject to the *Frye* inquiry.  *In re Commitment of Simons*, 213 Ill.2d 523, 821 N.E.2d 1184 (Ill. 2004).

20 at 43-44 (Alan Schatzberg, M.D. deposition excerpts).[17]  It is now the subject of FDA mandated BLACK BOX warnings based on a specific finding of causality.

In *Cassidy v. Eli Lilly*, Chief Judge Ambrose found that Dr. Healy's views about SSRI suicidality had "attended general acceptance in the relevant scientific community."[18]  Magistrate Judge Beaman found the same about Paxil-induced suicidality in his May 8, 2001 *Daubert* opinion in *Tobin v. SmithKline Beecham*. Exhibit 22.  The DSM-IV-TR §333.99 link from SSRIs to akathisia to suicidality preexisted those holdings.  Exhibit 19.  Since that time the FDA has found causality and mandated BLACK BOX warnings.  The notion that SSRI's trigger suicidality has now, indeed, become generally accepted.

**B.**     **A Host of Peer-Reviewed Literature Supports the Opinions.**  Both Drs. Glenmullen and Maris cite a wealth of peer-reviewed literature in support of their general causation opinions.  Several of the key articles were authored by defense experts in these cases.  *E.g.,* Exhibit 6 and Exhibit 23 (Rothschild, *et al.*, *Reexposure to Fluoxetine After Serious Suicide Attempts by Three Patients: The Role of*

---

[17] Dr. Schatzberg's textbook plainly states that "SSRIs can cause extrapyramidal side effects, EPS, including akathisia, . . ." and that "Akathisia in particular is associated with a poor clinical outcome, increased violence and even suicide."  Exhibit 20 at 26:21-23, quoting his textbook.

[18] Exhibit 21.  *Cassidy v. Eli Lilly*, Civil Action 821, U.S.D.C. (W.D.Pa. May 30, 2002, Ambrose, C.J.).  *See also Tobin v. SmithKline Beecham*, 164 F.Supp.2d 1278, 1283 (D.Wy. 2001)(scientifically reliable, legally admissible evidence to support finding that SSRI drug "Paxil can cause some people to become homicidal and/or suicidal.");  *Forsyth v. Eli Lilly & Co.*, 904 F.Supp. 1153 (D. Hawaii 1995).

*Akathisia*, J Clin Psychiatry 52:12, December 1991, 491-493).  Although Wyeth seeks to label the entire body of scientific literature on point as "case reports,"[19] this is overreaching.  Many of the articles, like the Rothschild article, employ the same kind of rechallenge methodology that was utilized in the FDA's own "causality algorithm."  Others are reports of epidemiological studies, like the 2000 Donovan paper which retrospectively focused on experience with more than 200,000 patients and found a highly significant elevated risk for "deliberate self harm" with an exceedingly low "p-value."  In *Tobin*, Magistrate Judge Beaman found this article to be a powerfully persuasive  basis for denying GSK's motion.  Exhibit 22.

Still other articles analyze the issue utilized the highly sophisticated "Bayesian" probabilistic model favored by Wyeth expert Dr. Judith Jones.  In 2005, a meta-analysis of SSRI clinical trial data was published in a peer-reviewed article in which the authors were granted access to previously unpublished data.  Exhibit 24 (Aursnes, *et al.*, *Suicide attempts in clinical trials with paroxetine randomised against placebo*, BMC Medicine 2005, 3:14;1-5).    Using  a  Bayesian  approach  to  causality

---

[19] In *S.M. v. J.K.*, 262 F.3d 914, 921-22 (9th Cir. 2001), the Court cited Professor Christopher Slobogin's article, "*Doubts About Daubert: Psychiatric Anecdata as a Case Study*, 57 Wash. & Lee L.Rev. 919, 922 (2000), in support of its decision supporting psychiatric testimony on debatable issues, especially in the absence of specific testing by the drug maker on point.  The reason is obvious.  When a drug manufacturer fails to test the relevant hypothesis, of necessity, courts focus on the "best available" scientific information.  Sometimes such information falls into Professor Slobogin's penumbral category of  "anecdata".  *See, also, Mendes-Silva v. U.S.*, 980 F.2d 1482 (D.C.Cir. 1993).  While it is true pure case reports are generally thought not to be, in and of themselves, sufficient to establish causation, they provide important corroborative evidence.

determination, similar to the one developed by Dr. Jones, these authors examined paroxetine clinical trial data from the late 1980's. While taking a "more conservative approach" in measuring outcomes, their statistical analysis revealed that adults (in a similar fashion to children) taking antidepressants have an increased risk of suicide attempts. *Id*. at 5. Additionally, the authors recommended the use of SSRI antidepressants with the adult population be restricted in the same fashion as they are for children and adolescents.

Finally, there is the 2005 Fergusson, Healy paper from the prestigious British Medical Journal. Exhibit 25 (Fergusson, *et al.*, *The association between suicide attempts and SSRIs: A systematic review of randomized controlled trials*, BMJ; 330; 19 February 2005). The study analyzed all 702 published SSRI clinical trials and found a 2.28 times greater rate of suicidal acts on the SSRIs compared to placebo. *Id*. at 1, 4. The study illustrates the risk applies both to anxious and depressed patients, and was apparent since 1988. Dr. Healy and colleagues concluded: "A significant increase in the odds of suicide attempts . . . was observed for patients receiving SSRIs compared with placebo . . .. Our systematic review, which included a total of 87,650 patients, documented an association between suicide attempts and the use of SSRIs." *Id*.

The list could go on. The point is, there is ample evidence in the peer-reviewed literature documenting the relationship between SSRI's and suicidality.

**C.**    **The Hypothesis is Testable.** As we point out in our separate *Daubert* brief, Eli Lilly actually devised a test protocol, employing "rechallenge" methodology, to prove or disprove the connection between Prozac and suicidality in the "small vulnerable subpopulation" of patients. It never conducted the test. Neither has Wyeth. This relegates the Court to other, less specific kinds of testing, like rechallenge reports and retrospective analyses. Nonetheless, it is still testable and, to the extent that tests or experiments have been done, they verify the causal link.

**D.**    **The Rates of Error Are Within Scientific Norms and Acceptable Probability Limitations.** The rates of error of these studies, usually expressed in terms of a p-value of .05 or lower, are all within scientific norms. For example, the p-value in the Donovan study is .001. Although it is true the recent FDA calculation of an odds ratio of 2.29 for patients in Jeff Giles' age group only has only a .15 p-value, that still represents 85% certainty, which meets any conceivable concept of preponderance of the evidence. Courts must be especially careful about abrogating the jury's constitutional role as fact finder by imposing burdens of proof in the *Daubert* context which are legally inappropriate.[20]

---

[20] As Judge Weinstein recently wrote: "Courts must be especially careful not to hobble the jury system by excluding potentially useful evidence. Prematurely cutting off the flow of evidence to the jury generally favors defendants, who do not have the burden of proof on most issues, leading not only to a violation of the Constitution, but a tilting of the scales of justice." *Schwab v. Philip Morris USA, Inc.*, 449 F.Supp.2d 992, 1249-50 (E.D.N.Y. 2006). *See McCulloch v. H. B. Fuller Co.*, 61 F.3d 1038, 1045 (2nd Cir. 1995).

## III.    THERE IS AMPLE EVIDENCE OF GENERAL CAUSATION

Like the good lawyers they are, Wyeth's counsel went to school on this Court's opinion.  *See* Exhibit 26 (*Caraker v. Sandoz Pharmaceuticals Corp.* 188 F.Supp.2d 1046 (S.D.Ill. 2001).  Thus schooled, they focus primarily on the epidemiological evidence and argue it "refutes plaintiff's experts' general causation opinions."  As we shall see in subsection C, *infra*, Wyeth overstates its case.  The available epidemiological evidence does not exonerate Effexor.  But before turning to that evidence, we should first consider two types of causality evidence that were not available to the Court and counsel in the *Caraker* case.

### A.    Wyeth's Own Clinical Trial Data regarding Effexor Shows  Marked Risk for Suicidality.

As noted above, the quest for the "Teicher Phenomenon" of SSRI-induced suicidality was described by Eli Lilly's consultants (in private) in 1991 as being one for the proverbial "needle in the haystack."  Exhibit 4.  In spite of that, suicidality literally pops out of Wyeth's clinical trial data on Effexor.  Specifically, the data submitted by Wyeth to the FDA shows that in these "pivotal" trials, 3,082 patients were treated with venlafaxine vs. 739 patients on placebo.  Seven of the Effexor patients completed suicide, and 36 made a suicide attempt.  Thus, the percentage of patients who either attempted or completed suicide was 1.40%.  The comparable percentage of placebo patients is 0.41%.  In scientific jargon, this translates to a relative risk of a suicidal act, lethal or not, of 3.43 to 1, with a 95%

confidence interval of 1.07 to 11.02 and a p value of .027. This is hard, data-based evidence of a serious problem.  It is, in and of itself, a sufficient basis for an opinion regarding general causation.

Dr. Valuck, Wyeth's own expert witness in this case, has written a peer-reviewed article about SSRI's and suicidality, in which he discusses the "activating side effects" of SSRI's, *i.e.*, "agitation, anxiety and insomnia" and observed "[o]ther **clinical trials** have shown that venlafaxine, too, is associated with higher rates of these adverse effects." Exhibit 27 (Valuck, *et al.*, *Antidepressant Treatment and Risk of Suicide Attempt by Adolescents with Major Depressive Disorder*, CNS Drugs 2004: 18(15); 1128-1129); Exhibit 5 at 69-73.  Peer-reviewed literature, by Wyeth's own expert, analyzing their own clinical trial data, and finding an association with known precursors of suicidality, and, yet, Wyeth *still* argues there is **no** reliable scientific evidence linking Effexor with akathisia and suicidality?

**B.    Wyeth's Internal Causality Assessments Also Establish Causality.**

Also not available in *Caraker* was *admissions* in internal company documents of a causal connection between suicidality and its known precursors. Exhibit 28 (Wyeth Causality Assessments)(FILED UNDER SEAL) contains a sampling of these documents.  After conferring with Wyeth's counsel, the following summaries of several of these cases are included in this portion of the public brief:

A 46-year old man (same age as Jeff Giles) started venlafaxine on June 8, 1994.  By June 11th, he had "nervousness" and felt "wired."  Wyeth said it had a "probable" relationship to the drug.  [WY-GIL-0011599; patient 20818002].

A 48-year old woman had "extrapyramidal syndrome" (akathisia is one) within two hours of taking her first tablet.  Wyeth said "definite" relationship.  [WY-GIL-0025951; patient 003].

A different 49-year old woman had anxiety, hallucinations and insomnia of a "severe" nature.  Wyeth said the relationship was "definite." [WY-GIL-0022237; patient 001].

A 41-year old male took a "severe" overdose of medicine on day 37 of his Effexor therapy.  Wyeth said "definite." [WY-GIL-0021111; patient 30101061]

A 54-year old female developed an outright "psychosis" with "suicidal ideation" on day 13.  Wyeth said "probable." [WY-GIL-0020075].

Although there are no causal admissions regarding two other patients, their histories are very interesting.  One, a 51-year old man, developed agitation and twitching after only one dose that was so severe that he withdrew from the study.  [WY-GIL-0021659; patient #012].  A 52-year old man with no prior history of suicidal behavior and no active plan for same, ingested only two doses before he escaped from the hospital and threw himself under a train.  [WY-GIL-0025090; patient #001].  For some reason, Wyeth said "not related."

A 46-year old female had "worsening depression with suicidal ideation" on day 2.  Wyeth did not bother to assess the relatedness.  [WY-GIL0019897; patient #C1143].

A 29-year old woman was "discontinued from the study because of the suicidal thoughts and agitation" which she experienced within the first 8 days of venlafaxine therapy.  Wyeth's investigator found it to be "probably" related to the drug. [WY-GIL-0019911; patient #0001].

A 26-year old male's "suicidal ideation" was "probably related to the test article." [WY-GIL 0019917; patient #0003]. So, too, was the "intermittent suicidal ideation" of a 36-year old female. [WY-GIL0019974; patient #0937].

On the other end of the age spectrum, where the FDA has suggested that there is a "protective" effect, a 71-year old male's "acute suicidality" was determined by Wyeth to be "probable." [WY-GIL-0019985; patient #0008].

Wyeth's experts in this case argue that Jeff Giles' depression simply worsened. But their investigator found one patient's "treatment emergent" "worsening depression" and "suicidal intent" on day 12 of her Effexor therapy were "possibly related" [WY-GIL-0019989; patient 0032].

Back in Jeff Giles' age group, a 54-year old woman was discontinued from Effexor because of "psychosis, worsening depression, and suicidal ideation" after only 12 days on venlafaxine. [WY-GIL-0019992; patient 031].

A 41-year old male "had no suicidal ideation" at the time of his entry into the clinical trial. After five weeks on Effexor, with dosing titrating up, he attempted suicide via a massive overdose. Wyeth's investigator found the suicide attempt definitely related to the drug. [WY-GIL 0019994; patient #0061].

Finally, a 47-year old female developed worsening depression and suicidality on day 7. She tried to kill herself with an overdose of Effexor. Wyeth's investigator found the suicidal attempt to be "probable" in relationship to the drug. [WY-GIL-0020000; patient #0011].

These 16 cases are illustrative. Even one "probable" or "definite" by Wyeth itself should suffice to prove the point, *i.e.*, for a "small vulnerable subpopulation" of patients, these drugs are bane, not boon.

Although these documents were not available in time to provide them to either Drs. Glenmullen or Maris at the time their reports were due, they do provide separate, independent, objective, unimpeachable corroboration for their opinions.

**C.**   **Available Epidemiological Evidence Condemns Effexor.**   None of the SSRI/SNRI manufacturers has conducted *prospective* studies to prove/disprove the hypothesis of a causal relationship between their drugs and suicidality or its precursors.  That leaves "science" to the realm of post-factor, *observational* studies. Wyeth cites several favorable studies.   But there are others which are decided unfavorable for them.  For example, the Donovan study involved more than 250,000 patients and found a statistically significant, highly elevated risk of "deliberate self harm" with an exceedingly low "p-value."  Exhibit 29 (Donovan, *et al.*, *Deliberate self-harm and antidepressant drugs*, June 13, 2000).  Similarly, as noted above, the Fergusson/Healy paper, analyzing the results of all of the companies' clinical trials, shows an elevated risk of suicidality.  Exhibit 25.   Finally, the Aursnes paper could also be included within the realm of "epidemiology."   It, too, demonstrates an elevated risk.  Exhibit 24.

**D.**   **The Pediatric Data and Wyeth's "Dear Doctor" re Same Establish Causality.**   We need not spend much time on the pediatric suicidality data.  After a comprehensive review of all of the companies' clinical trials, the FDA concluded the modern serotonergic antidepressants created an increased risk of suicidality "DUE TO

DRUG." Exhibit 30 (FDA Alert for Healthcare Professionals, May 2005).  According to the FDA's analysis, Effexor was the most suicidogenic of the drugs, with a whopping relative risk of 8.84.  Exhibit 31 (Excerpts from FDA Analysis).  Of course Wyeth itself had already been concerned enough about this data to send a *sua sponte* warning letter, without prior FDA approval.  Exhibit 32 (Wyeth's "Dear Healthcare Professional" letter, 8/22/03).  Effexor causes suicide in pediatric patients.

The question then becomes how?  What "precursor" conditions are triggered by Effexor, which, in turn, cause suicidality?  Although all nine of the Teicher & Cole factors are mentioned in various FDA advisories, by far the most common culprit is SSRI-induced akathisia.[21]  There is nothing to suggest that Effexor causes akathisia in children and not in adults.  Indeed, to the contrary, it has been observed, tested, and replicated (via rechallenge) in adults for nearly 20 years.  And, as noted above, is included in both the DSM-IV and in the textbook of Wyeth's expert Dr. Schatzberg.

Plaintiff's experts opine Jeff Giles' suicide was triggered by Effexor-induced akathisia.  The pediatric data is highly corroborative of that causal chain.  Moreover, any distinctions between adults and children go to the weight of the evidence, not its admissibility.

---

[21]  *See*, Exhibit 9.  (Listing nine "biologically plausible" mechanisms for SSRI-induced suicidality).  *See also* Exhibit 33 (Healy, *Lines of Evidence on the Risks of Suicide with Selective Serotonin Reuptake Inhibitors*, Psychother Psychosom 2003; 72:71-79).

**E.**   **The FDA's "Reclassified" Suicidality Data Establishes Causality.**

This is mentioned at some length in the opening section of this brief.  If the 2.30 odds ratios for young adults in the 18-24 year old patient population is causative, then the "most probable" 2.29 risk for patients in Jeff Giles' age group is equally so.

**F.**   **The Scientific Literature Corroborates Causality.**  As noted above, both Drs. Glenmullen and Maris cite to a wealth of peer-reviewed scientific literature in support of their general causation opinions.  Some, like the Fergusson, Healy epidemiological paper constitute independent bases for a determination of causality.  Others, like the numerous cited, peer-reviewed "case reports" provide important corroboration.

## IV.   THERE IS ALSO AMPLE EVIDENCE OF SPECIFIC CAUSATION

Wyeth does not really challenge the basic methodological approach of either of our experts.  Both use a form of "psychological autopsy" or  "differential diagnosis."  It is reliable methodology.  Indeed, as noted above, the "psychological autopsy checklist" that Dr. Maris authored and used in this case fully comports fully comports with a peer-reviewed article from another suicidology expert, currently serving as an expert witness for GSK in a Paxil/suicide case.  Exhibit 16; Exhibit 17; Exhibit 18.

Under this methodology, the experts try to determine first whether Jeff Giles' case fits the pattern of other SSRI-induced suicides and suicide attempts, so as to

"rule in" Effexor as a likely "substantial factor." They then also the focus on other potential risk factors. Because, as noted above, suicide is a "multifactorial" phenomenon, it is not possible to "rule out" such other factors entirely. However, the expert must necessarily proffer his opinion as to whether any of those risk factors, independently, or all of them, in tandem, would explain the suicide *in the absence of Effexor*. Both of the experts have rigorously and reasonably applied this methodology to the question at hand.

A. **There Is Ample Evidence to "Rule In" Effexor.** There is a demonstrable pattern in SSRI-induced suicidality cases. It has been called a "Puzzling Paradox."[22] Four of the six puzzle pieces derive from Eli Lilly's own description of the phenomenon. The fifth focuses on the existence, or non-existence, of akathisia or other recognized, biologically plausible precursors.[23] Dr. Maris' Psychological Autopsy form focuses the expert's attention on each aspect of the case to see whether the patient's experience fits the pattern.

In this case, Jeff Giles' experiences fit it like the proverbial glove. Jeff, who had never had a suicidal thought in his life and whom Dr. Pramote assessed to have

---

[22] The puzzling paradox metaphor was adopted by the undersigned counsel in 2002, before Jeff Giles' death. The elements, or puzzle pieces, derive largely from Eli Lilly's own rechallenge protocol and from the body of peer-reviewed scientific literature. Ironically enough, the November 16, 2006, FDA memorandum uses the same word, "paradox" to describe this puzzling phenomenon.

[23] Again, the peer-reviewed paper from Wyeth's own expert, Dr. Valuck, shows these "activating side effects" may be precursors of suicidality and Effexor (venlafaxine) is linked to them according to data from **clinical trials.** Exhibit 5 at 68-73.

no suicidal risk on the day he got a prescription for Effexor, became "suddenly suicidal" within a short period after starting the drug.  It was a completely alien or "egodystonic" feeling for him.  His actual death was both obsessive and violent.  And, most importantly, it was preceded by demonstrable akathisic/restless behavior.

Although Wyeth suggests the fact that Jeff killed himself after ingesting only three pills weakens the link, in fact, the exact opposite it true.  And logically so.  If there is something about a particular patient's "constitution" that puts him at risk for this side effect, as Pfizer's Dr. Roger Lane wrote in 1997, death would be a "welcome result" for patients who experienced SSRI-induced akathisia on top of a preexisting depression.  Exhibit 8.  Logically, then, one would expect the adverse event to manifest itself fairly quickly, as illustrated by the cases from Wyeth's clinical trials discussed in Section III.B., *supra*.

In the trial of *Tobin v. Smithkline Beecham*, the key defense theme was that "two Paxil pills didn't cause this tragedy."  Exhibit 34 (Excerpts from defense counsel's opening and closing statements, *Tobin v. GSK*).  But the jury found specifically that "Paxil can cause some people to commit homicide and/or suicide." They did so, in part, on the basis of Dr. Healy's explanation as to why two pills could immediately trigger such violence in a vulnerable individual.  *See* Exhibit 35 at 247-248 (Trial transcript, *Tobin*).

The expert reports of both Drs. Glenmullen and Maris demonstrate they carefully and methodically "ruled in" Effexor.  Exhibit 36 at 16-21 (Glenmullen Expert Opinion) and Exhibit 37 at 15-24 (Maris Expert Opinion).

### B.   The Experts Reasonably "Ruled Out" Other Suicide Risk Factors.

Although, as noted elsewhere, one need not "rule out" the contributing role of any given risk factor when there are multiple causes that contribute to suicidality, it is important for the expert to focus on these other risk factors and to provide a cogent opinion as to whether any of them individually, or all of them in tandem, would explain the death *in the absence* of Effexor.  Both of Plaintiff's experts have done so. Exhibit 36 at 16-21; Exhibit 37 at 8-24.

Wyeth identifies four different risk factors which it says Jeff Giles had for suicide:  (1) depression, (2) unemployment, (3) significant activity restrictions, and (4) chronic pain.  We consider the evidence concerning them, in inverse order.

### 1.   Jeff had just undergone successful surgery to alleviate his chronic pain.  Jeff Giles had a serious accident at work in 1995.  For the next seven years, although in serious, chronic pain, he continued to engage in pleasurable activities and continued to work.  In 2002, he finally decided to get surgery to alleviate the pain.  The surgery was conducted on September 12, 2002, and was successful.  According to the records and deposition of his surgeon, Dr. Grubbs, he had a good result and could "return to normal activities" within one month.  The

notion that he lived in chronic pain for seven years and then, one month after a successful surgery to alleviate that pain, he shot himself to escape from pain, is far beyond illogical.  It is idiotic!

> **2.**      **Jeff was going hunting with his son on the day of his death.**

If there was anything that Jeff loved to do it was hunt and fish with his only son.  On the day of his death he was going out to "rattle deer" for Jason.  That is hardly the picture of a moribund, sedentary man who would kill himself.  Moreover, as noted above, Dr. Grubb had advised Jeff he would be able to go back to work, and other activities, within approximately one month.  Again, the suggestion that he killed himself because of inactivity is contrary to the evident facts and to common sense.

> **3.**      **Jeff had lots of "papers" and lots of job opportunities.**  Jeff

Giles had worked in the mining industry for his entire life.  To a miner, periodic layoffs are a way of life.  He had been laid off before.  As Jackie testified, he always painted houses, cut grass, or found other, profitable endeavors to keep food on his families table.  Exhibit 38 at 54-55 (Jacquelyn Giles deposition excerpts).  Jeff, Jackie, and Jason lived a simple lifestyle.  They lived in a debt-free family home given to them as a wedding present.  Jeff was clearly the kind of guy who kept himself busy with profitable endeavors.

Jeff also had several different skills sets and "papers" to document them. Exhibit 39 at 9-14 (Don Giles deposition excerpts).  Jeff also had contacts through family and friends who could assist him in finding other employment.

The long and short of it is that Jeff was not likely to remain unemployed. Indeed, even Wyeth's own vocational expert, Mr. English, has opined Jeff would be employable and employed.  Exhibit 40 at 26 (James England deposition excerpts).

**4.      On October 28, 2002, Dr. Pramote diagnosed a one time "mild to moderate" depression.**  Dr. Pramote uses the word "depression" in his records, and has testified that on October 28, 2002, he diagnosed Jeff with depression and prescribed Effexor as an antidepressant. Exhibit 41 at 62-63 (Dr. Pramote Anantachai deposition excerpts).  However, he did not diagnose a "major depressive disorder." Rather when asked that specific question he replied, " I -- I think, you know, this is -- to the  best of my recollection, I think he has mild to moderate degree of depression, yes."  *Id*. at 66; *accord id.* at 109, 130.  Significantly, one of the diagnostic criteria for major depressive disorder which Jeff did *not* have was suicidality.  *Id*. at 67-68. Moreover, it is significant that this is the first time in six years of treatment that Dr. Pramote had ever had the impression that Jeff was ever depressed.  *Id*. at 141.  This is the testimony of Jeff's long time treating physician.[24]

---

[24] Dr. Pramote also recalls diagnosing hypertension.  *Id*. at 68-69.  Jackie Giles recalls Jeff telling her that Dr. Pramote had given him blood pressure medication. Exhibit 38 at 124.  Given Dr. Pramote's diagnosis of hypertension (and his halting English), it is not surprising there was a

Courts and counsel frequently talk about "analytical leaps" on the part of experts. As this Court considers Wyeth's arguments, it should consider the analytical leap that Wyeth's experts take from this evidentiary foundation. One of their psychiatrists, Dr. Allen, opines that, contrary to Dr. Pramote's testimony, Jeff really had a major depressive disorder, that he had it for years, and that this was the most likely cause of his death. Their expert Dr. Tichnor echoes this refrain. Even Dr. Schatzberg chimes in on the depression tune, although he also seeks to blame "chronic pain."

It is not surprising that Wyeth and its experts seize on depression as the culprit, even if it requires them to stretch the facts way beyond the diagnosis and testimony of the man who treated Jeff for years. Indeed, that has been *litigation strategy* for SSRI companies since this issue first arose in 1990. At that time, Eli Lilly, maker of Prozac, was the major defendant. It tried to treat the issue of Prozac-induced suicidality as a "public relations" issue, and developed a three-pronged PR strategy for dealing with it. Prong one was to argue "it's the disease, not the drug." Exhibit 42 at 33-42 (Mitch Daniel deposition excerpts, *Espinosa v. Lilly*). This strategy worked well for Lilly, and it is no surprise that Wyeth reprises it.

But does this testimony really "fit" the facts? Is it logical? To buy into Wyeth's defense, one would have to believe Jeff Giles was in chronic pain for years,

---

misunderstanding about the nature of the medication.

and was seriously depressed for years, and then, suddenly, a month after getting surgery to alleviate the pain, and two days after starting a drug to treat the depression, his underlying ailments overwhelmed him.

Another problem with this line of argument is that a paradoxical, drug-induced worsening of depression was described, as early as 1993, Exhibit 9, as a likely "biologically plausible" explanation for the phenomenon of antidepressant-induced suicidality.  In other words, even if, as Wyeth's experts testify, Jeff's depression suddenly got worse, this still does not exonerate Effexor or Wyeth.  Wyeth was on notice of that association for nearly a decade before Jeff's death and it totally failed to warn anyone of the risk.

One would also have to accept that, contrary to what the FDA said in its November 16th Memorandum, there is no paradoxical worsening of depression for some people who start antidepressants.

## Conclusion

It is astonishing in light of the current state of scientific evidence that Wyeth would seek to resurrect a general causation argument on *Daubert* grounds.  But resurrect they have done.

Drs. Glenmullen and Maris are both well-qualified to testify in this case.  The "intellectual rigor" that they bring to bear on their testimony is the same that they employ their respective professional jobs.  Moreover, their  opinions regarding both

general and specific causation are thoughtful, thorough, and well-founded on reliable

science and adequate facts.  Finally, their testimony will certainly be helpful to the

trier of fact.  Therefore, Wyeth's motion should be denied.

Respectfully submitted,

VICKERY WALDNER & MALLIA, LLP

*/ss/Arnold Anderson (Andy) Vickery*
Arnold Anderson (Andy) Vickery
Texas State Bar No. 20571800
One Riverway Drive, Suite 1150
Houston, TX  77056-1920
Telephone: 713-526-1100
Facsimile: 713-523-5939
Email: andy@justiceseekers.com

## Certificate of Service

I certify that on this 20th day of April, 2007, Plaintiff's Memorandum in
Opposition to Wyeth's Motion to Exclude Dr. Glenmullen's and Dr. Maris' Opinions
Based on Federal Rule of Evidence 702 has been electronically filed with the Clerk
using the CM/ECF system, which will automatically send email notifications of such
filing to the following attorneys of record:

David S. Rutkowski, Esq.
JONES DAY
51 Louisiana Avenue, NW
Washington, DC  20001-2113

Larry E. Hepler, Esq.
Beth A. Bauer, Esq.
BURROUGHS, HEPLER, BROOM, MACDONALD,
  HEBRANK & TRUE, LLP
Two Mark Twain Plaza, Suite 300
103 West Vandalia Street
Edwardsville, IL  62025-0510

Mark Hermann, Esq.
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH  44114-1190

Amber B. Shushan, Esq.
JONES DAY
1420 Peachtree St., NE, Suite 800
Atlanta, GA  30309-3053

Stephen W. Stone, Esq.
HOWERTON, DORRIS & STONE
300 West Main Street
Marion, IL  62959

Mark A. Kochan, Esq.
KOCHAN & KOCHAN
121 West Cherry
Herrin, IL  62948

*/ss/Arnold Anderson (Andy) Vickery*
Arnold Anderson (Andy) Vickery